STATE of Missouri, Respondent,

v.

Rafael LOPEZ, Appellant.

Rafael LOPEZ, Appellant,

v.

STATE of Missouri, Respondent.

Nos. WD 46435, WD 49566.

Missouri Court of Appeals, Western District.

Feb. 14, 1995.

As Modified May 2, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 2, 1995.

Application to Transfer Denied June 20, 1995.

Gary E. Brotherton, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, P.J., and KENNEDY and BERREY, JJ.

BERREY, Judge.

■ Appellant appeals his conviction by a jury of tampering in the first degree and the 15 year sentence imposed. He was sentenced as a "persistent offender." He also appeals the denial of his Rule 29.15 motion.[1]

Appellant alleges five points of trial court error: 1) in denying appellant's motion to recuse himself, 2) by overruling appellant's motion for judgment of acquittal, 3) by sustaining the state's *Batson* objection to appellant's preemptive strike of venireperson Danny Smith, 4) by overruling appellant's objection to state's peremptory strike of venireman Willard Olinger, and 5) by overruling appellant's objection to portions of the state's closing argument.

On April 18, 1991, Daniel Bieker, Jr., notified the Kansas City Police Department that his 1982 gray over silver Pontiac Grand Prix had been stolen. Bieker had parked his car in a lot behind the Westport flea market and it was gone when he returned. He supplied the police with the license and VIN numbers.

Richard Stanley was outside his apartment at 4505 Jarboe about 5:30 a.m. on May 12, 1991 watching his dog. The sun was up and the street lights had been turned off. Stanley observed a gray Pontiac Grand Prix park in front of his building. The driver exited the car and walked away and out of sight. Several minutes later the driver reappeared walking in the street and "he was looking and trying door handles of all of the cars on the west side of the street." Stanley then observed the person approach a Buick Riviera. The window was low and he put his "hands on the passenger side glass." Stanley stated that he knew the owner of the

Buick and this person with his hands on the glass was not the owner. The Grand Prix and the Buick were across the street from each other. Stanley asked appellant "what in the Hell he was doing." He received no response and Stanley then:

challenged him the second time and asked him what was he doing—I said, 'That's not your car. I know who owns that car. What are you doing messing with it?' And he kind of turned around and kind of looked at me and kind of waved me off as if to—just kind of waved his arms like that. And I challenged him again.

Appellant was about four or five feet away. Stanley kept appellant in sight, continued to "challenge him," and kept walking toward him. Appellant backed away and eventually left the area. Stanley then called the police. Stanley also approached the gray Grand Prix and saw keys in the ignition. Stanley reached through an open window and removed the keys. When the police arrived he gave them a description of the individual and the keys to the Grand Prix. Subsequently, Stanley stated to the police, "There he is" referring to the party he had been observing. The police apprehended the party and Stanley identified him. He also identified him at trial. The Grand Prix owner, Bieker, subsequently testified he and his mother jointly owned the car. Daniel Bieker was the "primary owner of the car" and he was the person who drove it and had sole possession of the vehicle. Bieker testified his mother was retired and lived in Hayes, Kansas.

I

Appellant's first point alleges the trial court erred in not recusing himself because he was biased and prejudiced against appellant and one of his attorneys, Ms. Tannenbaum. The alleged bias is attributable to the trial court's initial concern about appellant's request for an interpreter. Appellant alleged he did not have sufficient command of the English language to proceed without an

---

1. We note that appellant has failed to preserve his appeal for post-conviction relief pursuant to Rule 29.15, because he has not raised a point of error. We therefore consider his appeal from the denial of his Rule 29.15 motion abandoned. *State v. Simmons*, 861 S.W.2d 128, 130 (Mo.App. 1993).

interpreter. The trial court inquired as to his right to an interpreter and he was advised that the United States Supreme Court had held an interpreter was required for a defendant who claimed not to understand English. Upon being so advised the trial court stated it would allow a short delay in the proceeding for the interpreter to arrive.

■ The delay in the proceeding apparently did not please the trial court but he did not express any overt opinion on the appellant's inability to speak English. The record does not reflect a personal bias or enmity of the judge toward the appellant. The trial court's lack of knowledge regarding appellant's right to an interpreter is not sufficient grounds for his disqualification. *Jetz Service Co. v. Chamberlain,* 812 S.W.2d 946, 949 (Mo.App.1991).

Appellant in point one further complains that the trial court erred in citing Ms. Tannenbaum for criminal contempt, that this displayed bias and prejudice against the appellant. This exchange occurred when the trial court attempted to secure information from the jail guards about appellant's alleged spitting, kicking and cursing at them when he was told he had to wear county issued socks to court. According to jail personnel who were to transport appellant to court, appellant got out of control. He stated he wanted to go to court bare footed. Appellant alleges that the trial court displayed bias and prejudice by use of the expression "tough hombres" and "young woman." Appellant alleges the use of "hombres" was meant as a racial slur by the trial court. The specific language of the trial court is as follows:

> Tell him that in my four years on this Bench I have never run into a situation of such misconduct and resistance, and I face some pretty tough hombres. He's absolutely far and away the most troublesome defendant we've had in this Court.

■ According to Webster's 5th Collegiate Dictionary, "hombre" is a variation of omber. Omber, is defined as a man. The comment equates to the trial court facing tough men, not an ethnic slur.

Whether a term can be characterized as derogatory depends on the context and manner of its use. The trial court used the complained of term, "young woman," as follows: "Young woman, I would suggest that you respond to my question." Although it would have been preferable to address Ms. Tannenbaum by name or as "counsel," the statement made by the trial court does not evidence bias or prejudice against the appellant.

The trial court expressed the thought that appellant owed an apology to the guards. Perhaps so! This does not rise to prejudice against the appellant.

Appellant alleges that the trial court lost his temper and therefore should have recused himself. *City of Kansas City v. Wiley,* 697 S.W.2d 240, 244 (Mo.App.1985). However, the transcript does not reveal the trial court losing his temper. It does reveal a trial court attempting to control the courtroom and promptly proceed with a trial. Likewise, appellant's counsel had a duty to object as incidents of legitimate advocacy, which she did. *State ex rel. Tannenbaum v. Clark,* 838 S.W.2d 26 (Mo.App.1992).

Although the trial court admonished counsel on several occasions, such action did not require him to recuse himself. *State v. Moffitt,* 754 S.W.2d 584, 589 (Mo.App.1988). The comments complained of were all during pretrial and without the jury being present. An example of judicial intolerance is found in *State v. Wren,* 486 S.W.2d 447, 448 (Mo. 1972). The trial court instructed counsel in the jury's presence to proceed "ad nauseam." It further degraded defense counsel and commented on the evidence. The court held this conduct violated Canons of Ethics Rules 1.05, 1.10 and 1.15. The court noted that such reprimands or admonishments may be called for, but should be handled so as not to prejudice appellant's case in the eyes of the jury. The instant case was without a jury present and does not rise to the level of intolerance displayed in *Wren.*

■ A judge is entitled to the presumption that he will not undertake to preside over a trial in which he cannot be impartial. *Blando v. Reid,* 886 S.W.2d 60, 65 (Mo.App. 1994). Prejudice is the attitude of personal bias toward a party or obvious favor of an

adverse party to the others detriment. *State ex rel. Wesolich v. Goeke,* 794 S.W.2d 692, 697 (Mo.App.1990).

■ In order for the bias and prejudice to be disqualifying, it must arise from an extra judicial source and result in an opinion on the merits on some basis other than what the judge has learned from participation in the case. *State v. Hunter,* 840 S.W.2d 850, 866 (Mo. banc 1992). In *State v. Moffitt,* 754 S.W.2d 584, 588–89 (Mo.App.1988), appellant complained that the trial court's comment was prejudicial to his defense. The trial court in response to an objection and colloquy between counsel stated: "The jury understands she doesn't know exactly which week-end it was. Let's move on we're quibbling over words that are plain to the jury." These statements were not comments on the evidence or the witnesses credibility. The admonition was not hostile and did not convey bias to the defendant. *See State v. Koonce,* 731 S.W.2d 431, 441 (Mo.App.1987).

The trial judge eventually held Ms. Tannenbaum in contempt and this was overturned in *State ex rel. Tannenbaum v. Clark,* 838 S.W.2d 26 (Mo.App.1992). The opinion does not reflect that the trial court exercised bad faith in the contempt proceedings or that the trial court was prejudiced against either appellant or Ms. Tannenbaum. As we have noted, this entire episode occurred out of the jury's presence. "A trial judge's remarks or suggestions outside the presence of the jury do not prevent the defendant from having a fair and impartial trial." *State v. Owens,* 759 S.W.2d 73, 77 (Mo.App.1988).

Appellant's Point I is denied.

## II

Appellant next complains the trial court erred because it denied his motion for acquittal at the close of the state's case. The state's witness Bieker testified that he and his mother owned the 1982 Grand Prix that was stolen, that he had exclusive possession of the car, and had not given appellant permission to drive or use the car. Bieker's mother lived in Hayes, Kansas, and was also named as an owner on the title. She was not summoned to testify. Appellant alleges this was error because she might have granted appellant permission to use the car.

■ In determining the sufficiency of the evidence, we accept as true all evidence favorable to the verdict, including all favorable inferences drawn from the evidence and disregard contrary evidence and inferences. *State v. Sladek,* 835 S.W.2d 308, 310 (Mo. banc 1992). We do not weigh the evidence. *State v. Villa–Perez,* 835 S.W.2d 897, 900 (Mo. banc 1992). We do not determine credibility of the witnesses. *State v. Middleton,* 854 S.W.2d 504, 506 (Mo.App.1993).

■ The established rule is that ownership of stolen property may be established either by the actual owners, (Daniel Bieker, Jr., or his mother) or the one rightfully in possession, (Daniel) and a showing that the property was taken from the one who had charge and control of the property. *State v. McCoy,* 647 S.W.2d 862, 864 (Mo.App.1983). The lawful control and custody of property is a sufficient attribute of ownership to support the claim and proof of ownership. *Id.*

Appellant's Point II is without merit and is denied.

## III

Appellant alleges in Point III that the trial court erred in sustaining the state's *Batson* objection to appellant's use of a peremptory challenge to remove venireman Danny Smith. Appellant contends he provided a sufficiently race neutral explanation for striking Smith. Smith was a former Marine and appellant alleges that such a background is indicative of a person with strict law enforcement tendencies who would not be a good defense juror. Both Smith and the state's sole eyewitness are black males.

■ When racially motivated, peremptory strikes to remove venirepersons violate the equal protection rights of the struck venireperson. *Batson v. Kentucky,* 476 U.S. 79, 86–87, 106 S.Ct. 1712, 1717, 90 L.Ed.2d 69, 81 (1986). When the court sustains an objection to the defendant's attempt to remove a particular venireperson, on the ground that the attempted strike was racially motivated, that decision is entitled to great deference on appeal, and will be set aside on

appeal only if clearly erroneous. *State v. Gray,* 887 S.W.2d 369, 384 (Mo. banc 1994). The decisive question in the typical peremptory challenge inquiry is whether counsel's race neutral explanation for the challenge will be believed. *State v. Wilhite,* 858 S.W.2d 293, 296 (Mo.App.1993). Seldom will there be much evidence bearing on that issue, and the best evidence often is the demeanor of the attorney who exercises the challenge. *Id.*

When appellant attempted to use one of his peremptory challenges to remove Smith, the state objected. Appellant explained that he struck Smith because he had been in the Marines and as such may be more inclined to think that the rules should be strictly enforced.

Appellant did not ask the entire jury panel if they had served in the military. If prior military service was an important factor in the appellant's jury selection decisions, appellant should have asked the jury panel if any of them had served in the military. We agree with the trial court that if appellant had asked such a question, appellant's stated reason for striking Smith "would have been much more compelling."

We also note, as did the trial court, that appellant did not strike Mark Heineman, a white male, who like Smith, was single and of the same approximate age. Heineman had previously worked "in security" at the Metro Auto Auction. Both men also had in common the fact they were working in clerical positions involving finance.

A prospective juror's prior military service might conceivably constitute a race-neutral reason for the use of a peremptory strike. In this case, however, we cannot say the trial court was "clearly erroneous" in refusing to allow appellant to use a peremptory challenge to strike Smith.

Point III is denied.

## IV

In Point IV, appellant alleges the trial court erred in overruling his objection to the state's peremptory strike of venireperson Willard Olinger and for failing to require the state to provide a race neutral explanation.

Appellant contends the state struck Olinger, a white male, because the state's eyewitness was a black male and that the state wanted to maximize the number of blacks on the jury. Appellant also contends that the state effectively removed five additional whites from the jury by only exercising one of its six peremptory strikes.

Appellant expressly waived this challenge. Appellant was asked by the court if he had any objections to striking Olinger and his attorney responded, "No, Judge." The state used only one peremptory challenge and the appellant's attorney stated:

> For the record for future reference, in some circumstances I think the defense could object to the State only electing to choose one strike if it appeared that that was being done to circumvent Batson. I don't believe that's the case, and we don't have an objection to it in this case, Your Honor.

The appropriate time to raise a *Batson* motion is after the state has made, and before the defendant makes their peremptory strikes. *State v. English,* 795 S.W.2d 610, 612 (Mo.App.1990). A *Batson* motion is waived unless it is timely raised. *Id.*

Appellant failed to make a timely *Batson* challenge to the state's removal of Olinger. Appellant expressly waived any objection and therefore cannot now complain that the state should have provided a race-neutral reason for his removal.

We find no merit in appellant's contention that the trial court erred in allowing the state to exercise only one of its six peremptory strikes. Appellant expressly waived any objection to the state's use of only one peremptory challenge, and did not complain until after the defense had already made its peremptory challenges.

Point IV is denied.

## V

In Point V appellant alleges the trial court erred in overruling his objection and in denying his request for a mistrial during the state's closing and rebuttal arguments. Ap-

pellant first complains the prosecutor improperly referred to appellant's right not to testify and privilege against self-incrimination when she argued that the "knowledge" element of its case was "very difficult to prove by direct evidence, because it's rare that a Defendant will come forward and say, 'I did it.' "

A prosecutor is prohibited from making either direct or indirect references to an accused's failure to testify. *State v. Laws*, 854 S.W.2d 633, 636 (Mo.App.1993). A direct reference is made when the prosecutor uses words such as "defendant," "accused," and "testify" or their equivalent. *State v. Lawhorn*, 762 S.W.2d 820, 826 (Mo. banc 1988). An indirect reference is one that is reasonably apt to direct the jury's attention to an accused's failure to testify. *Id.* An indirect reference is improper only if there is a calculated intent demonstrated by the prosecutor to magnify that decision so as to call it to the jury's attention. *Id.*

The prosecutor's remarks were neither a direct nor indirect reference to the appellant's failure to testify or make an incriminating statement. The prosecutor stated that it was rare for "a" defendant not "the" defendant, to say, "I did it." The prosecutor consistently referred to the appellant during the course of her argument as "Mr. Lopez" not "the defendant." The comment was made in the context of discussing the difficulties of proving the "knowingly" aspect of the state's case by direct evidence, and was not a comment on the appellant's failure to testify and privilege against self-incrimination.

Appellant also alleges that the prosecutor improperly personalized her argument to the jury when she said that the evidence showed that the car appellant was driving had been stolen, and that if she "had any evidence to bring in" to show that appellant had stolen the car, she would have done so. The prosecutor added, "But I don't have that evidence."

It is generally considered improper for a prosecutor to personalize his closing argument. *State v. Shurn*, 866 S.W.2d 447, 463 (Mo. banc 1993). Improper personalization occurs when the prosecutor suggests a personal danger to the jurors or their families if the defendant were to be acquitted. *State v. Hamilton*, 847 S.W.2d 198, 200 (Mo. App.1993).

In the instant case, the prosecutor referred to herself in the first person. She did not suggest that the jurors or their families would be threatened if the appellant were not convicted. The prosecutor's argument that she did not have any evidence that had not been presented to the jury, did not constitute improper personalization and did not prejudice the appellant.

Finally, appellant also alleges the prosecutor improperly argued that the jury needed to be like Clay County and "send a message" by imposing the maximum sentence.

Our Supreme Court has held that a prosecutor may legitimately argue that the jury should "send a message" that criminal conduct will not be tolerated and should be severely punished. *State v. Cobb*, 875 S.W.2d 533, 537 (Mo. banc 1994); *State v. Olds*, 603 S.W.2d 501, 511 (Mo. banc 1980). In *Cobb*, the prosecutor stated:

> ... He was weaving, and thank God Deputy Moses caught him. We don't know what would have happened after that ... Send a message that [it] is unacceptable to be falling down drunk and driving car in this county. Send the message to everyone who would think about doing it, to everyone who endangers the lives of other citizens everywhere when they're driving on the highways while intoxicated.

*Id.* at 537. The court held that "we do not detect any impermissible design to incite the passions of the jury in the prosecutor's 'send a message' argument." *Cobb*, 875 S.W.2d at 537. In the present case, the prosecutor did as *Cobb* and many other cases authorize. The prosecutor urged the jury not to "come back with a very light sentence." The argument was not improper.

Appellant's Point V is denied. The conviction is affirmed.

All concur.